UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/7/2017

-------------------------------------------------------------------X

PALMER/KANE LLC,                              :
                                             :
                           Plaintiff,        :
                                             :            1:15-cv-7404-GHW
              -against-                      :
                                             :            OPINION AND ORDER
GARETH STEVENS PUBLISHING,                   :
                                             :
                           Defendant.        :
-------------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

　　　Plaintiff Palmer/Kane LLC alleges that Defendant Gareth Stevens Publishing infringed its

copyrights in a number of stock photographs by using them in a series of books without a license or

other form of permission.  At its inception, this lawsuit alleged infringement of eight photographs

with titles ranging from the evocative "Sandstone Arch in the Valley of Fire" to the slightly less

poignant "Executive with Calculator."  However, Palmer/Kane voluntarily dismissed its claims

relating to two of the photographs in June 2016, and has now decided not to pursue its claims with

respect to two others.  Accordingly, only four photographs remain at issue.

　　　In its motion for summary judgment, Gareth Stevens now attempts to establish that

Palmer/Kane lacks standing to bring this action because its registration certificate covering the

relevant photographs is invalid, and that, in any event, the photographs were used pursuant to and

within the scope of licenses granted by Palmer/Kane's exclusive licensing agent.  In its own motion

for summary judgment, Palmer/Kane seeks to establish that its registration certificate is valid, and

that Gareth Stevens infringed its copyrights by printing books containing the photographs at issue

prior to the issuance of any license and by selling copies of those books after the licenses had

expired.

The Court has already twice held that disputes of fact pervaded the question whether Palmer/Kane's registration certificate is valid for the purpose of conferring standing to sue in light of a provision added to the Copyright Act by the Prioritizing Resources and Organization for Intellectual Property Act of 2008. The record on summary judgment compels the same conclusion and also makes clear that disputes of fact preclude summary judgment on the question whether a license agreement covered Gareth Stevens's relevant use of the photographs. As a result, Gareth Stevens's motion is DENIED except with respect to Images 2 and 8, and Palmer/Kane's motion is DENIED in its entirety.

## I. BACKGROUND[1]

### A. Facts

Plaintiff Palmer/Kane LLC ("Palmer/Kane") is a stock photography production company that has been in business since 1975. *See* Def.'s Rule 56.1 Counterstatement (ECF No. 93) ("Def.'s 56.1") ¶¶ 4-6. Defendant Gareth Stevens Publishing ("Gareth Stevens") creates and publishes educational textbooks, instructional technology materials, reference works, and other similar materials and publications. *Id.* ¶ 8. Palmer/Kane alleges in this lawsuit that Gareth Stevens infringed its copyrights in a number of photographs that were created by photographer Gabe Palmer as works-made-for-hire for Palmer/Kane or its predecessor, Palmer/Kane Inc.[2] *Id.* ¶ 3.

Although Palmer/Kane initially included eight photographs in this suit, only four remain. On June 15, 2016, the parties stipulated to the dismissal of all claims relating to what are labeled in the amended complaint as Image 1 ("Superfund Clean Up # 1) and Image 3 ("Boy and Girl at Locker"). ECF No. 54. Additionally, in a letter dated March 31, 2017, Palmer/Kane informed the

---

[1] The following facts are drawn from the parties' Local Civil Rule 56.1 Statements and other submissions in connection with the instant motion, as well as Defendant's initial and renewed motions for the issuance of a request to the Register of Copyrights, and are undisputed unless otherwise noted.

[2] Palmer/Kane Inc. transferred all of its assets to Palmer/Kane LLC in 2008. Def.'s 56.1 ¶ 4. Because neither party contends that the difference between Palmer/Kane Inc. and Palmer/Kane LLC bears any relevance to these motions, the Court uses the name "Palmer/Kane" interchangeably to refer to both entities.

Court that it was withdrawing its opposition to Gareth Stevens's motion for summary judgment as to Image 2 ("Sandstone Arch in Valley of Fire") and Image 8 ("Mother and Daughter Coloring"). ECF No. 102. As a result, only the images identified in the amended complaint as Images 4-7— "Executive with Calculator," "Pharmaceutical Engineer," "Travel Agent," and "Senior Couple at Travel Agency," respectively—remain at issue (the "Images").

### 1. Registration of the Images

Each of the Images remaining at issue in this suit is registered with the United States Copyright Office (the "CO") under Registration No. VAu 529-623, which was issued with an effective date of June 25, 2001. Pl.'s Rule 56.1 Counterstatement (ECF No. 87) ("Pl.'s 56.1") ¶¶ 34, 36, 38, 40.[3] The history of how Registration No. VAu 529-623 came to be issued is highly material to the parties' motions.

On May 26, 1999, Palmer/Kane Inc. filed an application with the CO to register more than 900 photographs as an unpublished collection with the title "Past Mug Shots Images on the Stock Market Web Site as of 2/29/99." *Id.* ¶ 3. The application was signed by Palmer/Kane's principal, Patricia Kane. *Id.* ¶ 4. The deposit material submitted to the CO with the 1999 application consisted of printouts of pages from stockmarketphoto.com, the website of Stock Market Photo Agency, Inc ("Stock Market"). *Id.* ¶ 5. Stock Market was Palmer/Kane's exclusive licensing agent from 1985 until early 2000. *Id.* ¶¶ 6-7. During the life of that licensing-agent arrangement, Palmer/Kane submitted numerous photographs to Stock Market, including the "Past Mug Shots Images." *Id.* ¶ 8.

Throughout the course of Palmer/Kane's arrangement with Stock Market, Stock Market published near-annual print catalogs of photographs and registered those catalogs with the CO as

---

[3] References to "Def.'s 56.1" are to the Rule 56.1 counterstatement submitted in connection with Palmer/Kane's motion. References to "Pl.'s 56.1" are to the Rule 56.1 counterstatement submitted in connection with Gareth Stevens's motion. In both cases, the Rule 56.1 counterstatements contain both the assertions of the moving party and the responses of the non-moving party.

published works. *Id.* ¶¶ 9-10. There is no evidence in the record, however, that any of those catalogs contained the "Past Mug Shots Images."[4] In 1996, Stock Market also published and registered a glossy catalog of stock photographs available for licensing entitled *American Mosaic I*. *Id.* ¶ 11; Kjellberg Decl., Ex. 28. *American Mosaic I* contains several images credited as "Mug Shots," but the record does not make clear whether any of them are among the "Past Mug Shots Images" submitted to the CO for registration in 1999.[5] The Court was able to determine, however, that the excerpt submitted by Gareth Stevens does not contain any of the Images at issue in this lawsuit. *Compare, e.g.*, Decl. of Pat Kane in Supp. of Pl.'s Mot. for Partial Summ. J. (ECF No. 75) ("Kane Decl."), Ex. 1 (showing the Images), *with* Kjellberg Decl., Ex. 27 (excerpts from *American Mosaic I*). During the period in which Stock Market acted as Palmer/Kane's exclusive licensing agent, Stock Market also published and registered a number of catalogs in CD-ROM format, Pl.'s 56.1 ¶¶ 12-14, though again, there is no evidence in the record establishing that any of the Images were included on the CD-ROMs.

A print catalog published by Stock Market in 1998 included the phrase "Search over 30,000 images online at the hottest site in stock," lists the URL www.stockmarketphoto.com, and includes a screenshot of what appears to be the stockmarketphoto.com website. Pl.'s 56.1 ¶ 15; Kjellberg Decl., Ex. 33, at p. 5. According to Ms. Kane, however, the website was in beta at that time and did not "go live" to the public until sometime after she submitted the application to the CO in May 1999. Decl. of Pat Kane in Opp'n to Def.'s Mot. for Issuance of Request to Register of Copyrights Pursuant to 17 U.S.C. § 411(b)(2) (ECF No. 39) ("Kane 411(b)(2) Decl.") ¶ 10.

---

[4] Gareth Stevens asserts that the catalogs did contain the "Past Mug Shots Images," but, as Palmer/Kane points out, the evidence it cites does not support that conclusion. Gareth Stevens merely cites a number of printouts from the CO's online catalogs showing records of the registrations of the catalogs with no detailed information about their contents. *See* Decl. of Thomas Kjellberg in Supp. of Def.'s Mot. for Summ. J. ("ECF No. 84") ("Kjellberg Decl."), Exs. 10-22.

[5] This is so because the copy of the deposit materials submitted in connection with these motions is a poor-quality black-and-white photocopy of several pages of very small images which the Court cannot clearly make out. *See* Kjellberg Decl., Ex. 6. The Court observes that Gareth Stevens does not specifically assert that the images labeled "Mug Shots" in *American Mosaic I* are among the "Past Mug Shots Images," but only that the catalog contains "dozens of 'Mug Shots' images." *See* Pl.'s 56.1 ¶ 11.

Palmer/Kane attached to its 1999 registration application a separate page reading:

Previous Registration:

* A stock catalog/CD/web site containing these photographs were previously registered, however that registration did not apply to this specific photograph, only in the authorship in the catalog claimed by the Stock Market Photo Agency.

|  | Registration Number |  |
|---|---|---|
| Stock CD 2 | #863-782 | 2/26/99 |
| Stock CD 3 | #863-774 | 2/26/99 |
| American mosaic | #863-925 | 2/26/99 |

Kjellberg Decl., Ex. 52, at p. 3. Each of those registration numbers corresponds to a prior registration by Stock Market for published works. Kjellberg Decl., Exs. 24, 32, 53. However, Ms. Kane has submitted a declaration stating that she has no recollection of attaching this document to the 1999 application form and that, in any event, she could not have checked the accuracy of any information about those registration because the CO had no online resources at that time. Decl. of Pat Kane in Opp'n to Def.'s Mot. for Issuance of Request to Register of Copyrights Pursuant to 17 U.S.C. § 411(b)(2) ("ECF No. 39") ("Kane 411(b)(2) Decl.") ¶¶ 15-16.

By letter dated March 14, 2000, the CO notified Palmer/Kane that it was "delaying registration" for the [Past Mug Shots Images on the Stock Market Web Site as of 2/29/99] collection for the reasons enumerated below." Pl.'s 56.1 ¶ 19; Kjellberg Decl., Ex. 7. As relevant here, the letter explained that "Space 1 [Title of This Work] and the deposit indicate that publication has occurred; however the publication information [Date and Nation of First Publication of This Particular Work] has not been entered in space 3b as required." Pl.'s 56.1 ¶ 19. The letter explained that "a collection of items may be registered on one application only if each of the items within that collection were all first published together on the same date, or if all the items are unpublished."
*Id.* ¶ 20. The March 14, 2000 letter also explained:

[I]f some of the items you wish to register were published separately from other items in the collection (on different dates) that you also wish to register, please complete a separate application (and submit a new fee) for each work or group of

works that were first published on a different date.  Please ensure that the correct month, day, year, and nation of first publication is entered in space 3b of each application.

Alternatively, if all of the items you wish to register within the collection were all first published together on the same date that you indicate in space 3b of the application, please confirm this in a brief statement.

. . .

Alternatively, if publication has not occurred, please leave all of space 3b blank.

Pl.'s 56.1 ¶ 21; Kjellberg Decl., Ex. 7.  As an additional reason for the delay in registration, the March 14, 2000 letter from the CO stated:

Space 5 has been completed incorrectly.  Moreover, it refers to a document with information outside of the application, which is not acceptable. . . . The information in space 5 and the additional document indicate that this work is derivative of previously registered work; however, the derivative work statement has not been entered in space 6 as required.

Pl.'s 56.1 ¶¶ 22-23.

The CO's March 14, 2000 letter provided Palmer/Kane with 120 days to respond, but Palmer/Kane did not respond within that time.  Pl.'s 56.1 ¶¶ 24-25.  In a subsequent undated letter, the CO informed Palmer/Kane:  "Since we have not received a reply to our last letter concerning this work, we are closing our files and returning your copy. . . . If you wish to re-apply for registration. [sic]  It will be necessary to submit a new application, deposit and fee."  Kjellberg Decl., Ex. 8.  The letter included the notation "Enclosures:  Deposit Ret'd."  *Id.*

On May 18, 2001, Patricia Kane signed another application form to register the 900-plus "Past Mug Shots Images on the Stock Market Web Site," this time with "as of 2/29/99" omitted from the title.  Pl.'s 56.1 ¶ 27; Kjellberg Decl., Ex. 5.  As on the 1999 application form, space 3b (Date and Nation of First Publication of This Particular Work) was left blank.  Pl.'s 56.1 ¶ 30.  Space 5, which asks about previous registrations for the particular work, was also blank, and there was no additional document attached referencing previous registrations of Stock Market's materials.  *Id.* ¶ 29; Kjellberg Decl., Ex. 5.

Based on the 2001 application form, the CO issued Registration No. VAu 529-623 with an effective date of June 25, 2001.  Pl.'s 56.1 ¶ 31.  As with the application form, the certificate of registration does not indicate that the photographs registered thereunder had been published.  *See* Pl.'s 56.1 ¶ 32; Kjellberg Decl., Ex. 5.  Nevertheless, it is undisputed that the photographs that are the subject of the Registration No. VAu 529-623 were, in fact, published before the effective date of June 25, 2001, and even before the second application form was signed on May 18, 2001.  Pl.'s 56.1 ¶¶ 28, 33.

Ms. Kane asserts that she proceeded in this fashion at the CO's direction, and that she understood that the application form she signed on May 18, 2001 was not a new application, but rather a continuation of the application process that had begun in 1999, and a correction of the 1999 application form.  Notwithstanding the undated letter stating that the CO was closing the 1999 application, Ms. Kane testified that it was not closed, Kjellberg Decl., Ex. 54, Dep. of Palmer/Kane LLC by Pat Kane ("Kane Dep.") 222:13-223:13 (Mar. 29, 2016), and points to the fact that the deposit that accompanies the now-registered photographs (including the Images) bears a stamp indicating that it was filed in June 1999, rather than in May 2001.  *Id.* 222:22-225:11; *see also* Decl. of Clyde A. Shuman in Opp'n to Def.'s Mot. for Issuance of Request to Register of Copyrights Pursuant to 17 U.S.C. § 411(b)(2) (ECF No. 38) ("Shuman 411(b)(2) Decl.") ¶ 4 & Ex. 2.  Ms. Kane avers that she "had numerous conversations with the [CO] regarding [the] application and followed the instructions [she] was given to correct [the] application and to secure the VAu 529-623 registration."  Kane 411(b)(2) Decl. ¶ 8.

According to her declaration, she explained to the CO examiner who had written the March 14, 2000 letter that the "Stock Market website referred to [in] the registration title and in the footer was a beta version of the website and that the actual TSM website did not 'go live' or become available to the public until much later."  *Id.* ¶ 10.  Ms. Kane also avers that "[t]he [e]xaminer's other misconception in her March 14 letter was that the date in the title of the deposit was an indication it

was published on or by that date. She was unaware that a website could be constructed but not functional, thereby not offering anything for sale or distribution." *Id.* ¶ 11. According to Ms. Kane's declaration, the examiner then "recommended removing the date for clarity." *Id.* She also claims that the CO asked her to submit a new form "because the first one was such a mess with white out and it would be used to physically create the final certificate of registration." *Id.* ¶ 17. Ms. Kane states that she did so on May 18, 2011, but did not include a new deposit. *Id.* ¶¶ 17-18.

## 2. The Licensing and Use of the Images

Under the terms of an October 3, 2003 Photographer Representation Agreement (the "Agreement"), Palmer/Kane appointed Corbis Corporation ("Corbis") as its exclusive licensor for all "Accepted Images," which is defined in the Agreement as "an image, composite, or collection of images, film, or illustration, in analog or digital form, supplied by you to Corbis and accepted by Corbis, with or without any caption or related textual information." Kjellberg Decl., Ex. 1. Pursuant to the Agreement, Palmer/Kane granted to Corbis the right to "determine at [its] sole discretion the terms and conditions of any license or distribution of [Palmer/Kane's] Accepted Images, subject to the rights granted and restrictions imposed by and the limitations contained in this Agreement." *Id.* The rights granted to Corbis under the Agreement included the right to use, reproduce, publish, exhibit, publicly display, distribute, and create derivative works of any Accepted Images. *Id.* The rights granted by Palmer/Kane under the Agreement "also include[d] the right of Corbis to sublicense to and authorize Corbis' customers . . . to exercise the rights listed above when using Accepted Images." *Id.*

Palmer/Kane alleges that its copyrights in Images 4-7 were infringed by Gareth Stevens's inclusion of those images in three publications: "Working in Banking and Finance," "Working in Engineering," and "Working in Travel and Tourism." Am. Compl. (ECF No. 25) ¶¶ 22-24. Those books have also been referred to as "So You Want to Work in Banking and Finance," "So You Want to Work in Engineering," and "So You Want to Work in the Travel and Tourism Industry."

Decl. of Clyde A. Shuman in Supp. of Pl.'s Mot. for Summ. J. (ECF No. 76) ("Shuman Decl."), Exs. 3-5. Each of the books was created by Hodder & Stoughton Limited, A Member of Hodder Headline Group ("Hodder") in the U.K., and was published in the U.S., Canada, and the Philippine Republic pursuant to Coedition Agreements between Hodder and Gareth Stevens dated May 23, 2003 and June 16, 2003.[6] Kjellberg Decl., Exs. 3-4. The Coedition Agreements provided that Hodder would "produce 5,000 bound copies" of each book to be sold by Gareth Stevens in the United States. Kjellberg Decl., Exs. 3-4.

Effective August 1, 2004, Hodder entered into a Pricing Agreement with Corbis "with respect to future licensing by [Hodder] of Images from the Corbis Collection." Kjellberg Decl., Ex. 81. The Pricing Agreement includes a section entitled "Terms of License," which reads as follows:

> Licensing Parameters:
>
> > Non Exclusive, book format, single title production
> > One edition (hardback or Paperback – for clearing both editions see chart below)
> > Black & White or Colour
> > Printrun up to 40,000
> > License Period 7 years
> > Editorial use only

*Id.* at 1. The Pricing Agreement also provides a chart of "Image Pricing" and provides that, "[i]n consideration of Corbis offering the special Image Pricing set forth above, [Hodder] agrees it will, during the term of this Agreement, order and license at least £80,000 worth of rights managed images and royalty free images ("Minimum Commitment"). *Id.* at 1-3. It also includes a provision entitled "Invoicing/Usage Notification," which reads:

> [Hodder] agrees to notify Corbis of the Images used on a per usage basis. [Hodder] must include image IDs within each notice. Corbis will invoice [Hodder] according to this schedule. Overdue statements will be sent to [Hodder] after 30 days. [Hodder] is responsible for all payments due.

---

[6] Coedition publishing is a long-established practice in the book publishing industry. Pl.'s 56.1 ¶ 54. Under a typical coedition arrangement, an originating publisher creates a work and sells it into its own domestic market, then offers to publishers in other countries or markets the right to distribute "coeditions" of the same work, with minor adaptations to suit the coedition publisher's market, on negotiated terms. *Id.* ¶ 55.

*Id.* at 4. As is also relevant here, although the first page of the Pricing Agreement includes the phrase "License Period 7 years," a separate term provides that "[t]his Agreement will be in effect for 15 months commencing on the Effective Date." *Id.* at 3. Finally, the Pricing Agreement provides as follows:

> Attached hereto is a copy of Corbis' current Terms & Conditions ("T&C"). In the event there is a conflict between the T&C and this letter Agreement, the unique terms of this letter Agreement will govern.

*Id.*

Corbis Images UK, Ltd. issued documents entitled "Invoice and License Agreement" to Hodder on August 30, 2005, September 15, 2005, and October 25, 2005 for the use of Image 4 inside the book "So You Want to Work in Banking and Finance." Pl.'s 56.1 ¶ 56; Kjellberg Decl., Ex. 82. None of those Invoices and License Agreements specified a start or end date for any license, but each contained a footer reading:

> UPDATED LICENSE TERMS: You agree to accept Corbis' Standard Terms and Conditions, which govern your use of Corbis content. Corbis' current Terms and Conditions are located at <http://pro.corbis.com/creative/terms> and supersede all prior versions.

Def.'s 56.1 ¶ 31. The then-current version of the Standard Terms and Conditions, dated June 2005 and actually entitled "Content License Agreement," provided in relevant part that, "[u]nless otherwise stated in the Invoice, the license granted hereunder for the applicable Rights Managed Content allows You to use the Rights Managed Content obtained hereunder for one year from the date the applicable Invoice is issued." Shuman Decl., Ex. 6.

On June 18, 2005—a date prior to any of the above Invoices and License Agreements—WKT Company Limited issued an invoice to Hodder showing 5,000 copies of "Working in Banking and Finance"/"So You Want to Work in Banking and Finance" to be shipped from Hong Kong to Gareth Stevens (in Wisconsin) as "consignee." Kjellberg Decl., Ex. 84.

On August 26, 2005, September 14, 2005, and October 12, 2005, Corbis issued Invoices and License Agreements to Hodder for the use of Image 5 inside the book "So You Want to Work in Engineering." Pl.'s 56.1 ¶ 58; Kjellberg Decl., Ex. 85. As above, those Invoices and License Agreements did not specify a start or end date for any license, but contained the same "updated license terms" footer. *Id.* Another WKT invoice dated June 18, 2005—again, prior to the dates on any of the applicable Invoices and License Agreements—shows 5,000 copies of "Working in Engineering"/"So You Want to Work in Engineering" to be shipped from Hong Kong to Gareth Stevens as consignee. Kjellberg Decl., Ex. 87.

Corbis issued similar Invoices and License Agreements to Hodder on August 26, 2005, September 14, 2005, and October 11, 2005 for the use of Images 6 and 7 inside the book "So You Want to Work in the Travel and Tourism Industry." Pl.'s 56.1 ¶ 60; Kjellberg Decl., Ex. 88. A WKT invoice dated June 8, 2004—prior to the dates of the Invoices and License Agreements— shows 5,000 copies of "Working in Travel and Tourism"/"So You Want to Work in the Travel and Tourism Industry" to be delivered from Hong Kong to Gareth Stevens as consignee. Kjellberg Decl., Ex. 90.

### B. Procedural History

Palmer/Kane initiated this action on September 18, 2015, ECF No. 1, and Gareth Stevens filed its answer on October 7, 2015, ECF No. 16. On April 13, 2016, after substantial completion of fact discovery, Gareth Stevens filed a motion informing the Court that it intends to contest the validity of the registration certificate underlying Images 4-7 and requesting that the Court issue a request to the Register of Copyrights pursuant to 17 U.S.C. § 411(b)(2). ECF No. 32. In briefing that motion, the parties submitted various exhibits to the Court, including the registration applications and the certificate at issue, a declaration from the person who completed those applications, a transcript of Palmer/Kane's Rule 30(b)(6) deposition from a factually related case, and various other exhibits. On May 27, 2016, the Court denied the motion by oral decision,

concluding that Gareth Stevens had not established as a factual matter that Palmer/Kane had included inaccurate information on the registration application with knowledge that it was inaccurate. The Court explained, in relevant part:

> Defendant asserts that plaintiff submitted two applications before obtaining the copyright at issue, and that the first application was rejected and on the second Ms. Patricia Kane failed to disclose the fact that the images at issue had been previously published—the alleged inaccurate information.

> Plaintiff offers two primary arguments in response: (1) that the images were only available on a "beta website," and therefore were not published at the time of its initial application, and (2) Ms. Kane, who filled out the application, did not knowingly include any inaccurate information but followed the instructions of the Copyright Office in good faith.

> Palmer/Kane also provided a declaration from Ms. Kane in which she states she submitted the second application form at the request of the Copyright Office but that she did not submit a second deposit, and that she had "numerous conversations" with the Copyright Office regarding the application and followed their instructions.

> With respect to the first point, Gareth Stevens's response is that the website at issue was available to the public in February 1999, a contention it supports with a declaration from counsel's paralegal and a bevy of screenshots captured by the Internet [A]rchives. I will not linger on this point at this time but I note that the defendant's submissions lack information regarding how the Internet [A]rchive works and the reliability of the images captured by it. As a result, I am not persuaded at this stage in the litigation that the information presented to me makes it appropriate to submit this issue to the Register at this time, prior to additional factual submissions.

> With respect to the second point, Gareth Stevens argues that Ms. Kane knowingly filed the second, or in the plaintiff's words, corrected, application for copyright of unpublished works after the images at issue were published. In support of this contention, Gareth Stevens has submitted an excerpt of Ms. Kane's deposition testimony, in which she testified that by the time she filed the corrected application, the images had been published.

> However, Ms. Kane also testified that in her view the corrected application was a continuation of the application process that began with the first application, and that she understood from the Copyright Office that "once you start a process, you do not change the form you file on." Ms. Kane's deposition is consistent with her declaration—she viewed both applications as part of a single application process, and based on her understanding of advice from the Copyright Office, she understood that she should continue to pursue a copyright for an unpublished collection of images. I make no finding of fact on this point at this time.

> I cannot conclude, based on the evidence before me, however, that Ms. Kane knowingly provided inaccurate information to the Copyright Office. A factual finding that inaccurate information was knowingly included on a copyright application is a prerequisite to invalidating a copyright, 17 U.S.C. Section 411(b)(1)(A), and because that prerequisite is not satisfied, it is not appropriate to seek the advice of the Register at this time.
>
> . . . For the foregoing reasons, defendant's motion for the issuance of a request to the Register of Copyrights is denied without prejudice at this time. If at some point in the future, defendant is able to establish that Ms. Kane knowingly included inaccurate information in application for copyright registration, they should feel free to raise the issue again.

Telephone Conference Tr. 6:19-9:3, ECF No. 61, May 27, 2016 (internal citations omitted). On June 24, 2016, Gareth Stevens filed a renewed motion seeking issuance of a request to the Register of Copyrights pursuant to 17 U.S.C. § 411(b)(2). ECF No. 55. The Court denied the renewed motion by written opinion and order on October 24, 2016. ECF No. 69.

Palmer/Kane filed its motion for partial summary judgment on November 18, 2016. ECF Nos. 72-77. In its motion, Palmer/Kane initially sought summary judgment holding that Gareth Stevens had infringed its copyrights in Images 4-7, but not Images 2 or 8. Because Palmer/Kane has now abandoned its claims with respect to Images 2 and 8, see ECF No. 102, its motion is no longer "partial." Gareth Stevens filed its opposition to Palmer/Kane's motion on December 9, 2016, ECF Nos. 88-93, and Palmer/Kane filed a reply in further support of its motion on December 16, 2016, ECF Nos. 94-95.

Gareth Stevens also filed its motion for summary judgment on November 18, 2016. ECF Nos. 78-84. Palmer/Kane filed its opposition on December 9, 2016, ECF Nos. 85-87, and Gareth Stevens filed its reply on December 16, 2016. ECF Nos. 96-98.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))).

The party moving for summary judgment must first demonstrate the absence of any genuine dispute of material fact. *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323-24). If the burden of proof at trial would fall on the movant, that party's "own submissions in support of the motion must entitle it to judgment as a matter of law." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998). If, on the other hand, "the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322-23).

If the moving party meets its burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial'" in order to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or

unnecessary will not be counted." *Id.* In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal quotation marks and citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) (citation omitted).

In resolving cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).

## III. DISCUSSION

### A. Images 2 and 8

As a threshold matter, the Court must briefly address the fate of Palmer/Kane's claims of infringement of Images 2 and 8. In its opposition to Gareth Stevens's motion, Palmer/Kane requested that the Court defer ruling on those claims while an application to the CO for "corrective action" as to the relevant registrations was pending. Pl.'s Opp'n to Def.'s Mot. for Summ. J. (ECF No. 85) ("Pl.'s Opp'n") at 14-15. By letter dated March 31, 2017, after full briefing of the parties' motions, Palmer/Kane informed the Court that it "withdraws its opposition to Gareth Stevens's motion for summary judgment for Palmer/Kane's infringement claims relating to Image Nos. 2 and 8" in light of the CO's refusal of Palmer/Kane's request for corrective action. ECF No. 102. Accordingly, Gareth Stevens's motion is granted with respect to those two images, and those claims are dismissed. *See, e.g.*, *Krepps v. Insead*, No. 04-cv-3260, 01-cv-9468 (RWS), 2004 WL 2066598, at *3 (S.D.N.Y. Sept. 16, 2004) (granting motion to dismiss without reaching merits of motion when

opposing party withdrew its opposition); *see also United States v. Ogando*, No. 90-cr-469-S1, 1991 WL 44844, at *1 (S.D.N.Y. Mar. 28, 1991) (Leval, J.) ("Defendant . . . moved to suppress statements made by him on October 28, 1988. . . . By letter of March 19, 1991, the Government stated that it withdrew its opposition to the suppression motion. Accordingly, the motion of [Defendant] to suppress the October 28, 1988 statements is granted.").

## B. Images 4-7

### 1. Palmer/Kane's Standing to Institute This Action

Under the current version of the Copyright Act, registration of a copyright claim is not a condition of copyright protection. 17 U.S.C. § 408(a). Instead, for works created after January 1, 1978, a copyright "automatically inheres in a work the moment it is created, which is to say when it is fixed in a copy or phonorecord for the first time." Nimmer on Copyright § 7.16[A][1] (internal footnotes and quotations omitted). With certain exceptions that are not relevant here, however, a certificate of copyright registration *is* a prerequisite to bringing a civil copyright infringement action. 17 U.S.C. § 411(a).

In the Prioritizing Resources and Organization for Intellectual Property Act of 2008 (the "PRO IP Act"), Pub. L. 110-403, 122 Stat. 4256 (2008), Congress amended the Copyright Act to add a new Section 411(b). Pursuant to new Section 411(b)(1), a certificate of registration suffices as a prerequisite to bringing an infringement action "regardless of whether the certificate contains any inaccurate information," unless "(A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration." 17 U.S.C. § 411(b)(1).

As the Court has previously explained, Section 411(b)(2) requires courts to seek the advice of the Register of Copyrights before finding that this test is met and that a certificate of registration does not support an infringement action. *See, e.g., DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d

616, 623 (7th Cir. 2013) ("Instead of relying solely on the court's own assessment of the Register's response to an inaccuracy, the statute obligates courts to obtain an opinion from the Register on the matter."); *Palmer/Kane LLC v. Rosen Book Works LLC*, 188 F. Supp. 3d 347, 348 (S.D.N.Y. 2016) ("[C]ourts are in agreement that the provision is mandatory in nature . . . ."). In other words, before finding that knowingly inaccurate information would have caused the Register of Copyrights to refuse registration, a court must ask the Register whether that would have been the case.[7] Although the statute by its terms requires a referral "in any case in which inaccurate information described under [§ 411(b)(1)] is alleged," 17 U.S.C. § 411(b)(2), courts generally agree that they may first require the party seeking invalidation to establish as a factual matter that the applicant included inaccurate information on the registration application with knowledge that it was inaccurate. *See DeliverMed*, 734 F.3d at 625; *Rosen Book Works*, 188 F. Supp. 3d at 349. The Register of Copyrights agrees:

> While 17 U.S.C. § 411(b)(2) requires the court to seek the Register's advice when there is an allegation that an application contains inaccurate information, the Register observes that the statute says nothing about the timing of the request. The Register suggests that, at a minimum, the court retains the power to delay the request until a factual record has been developed, e.g., through affidavits or discovery.

Response of the Register of Copyrights to Request Pursuant to 17 U.S.C. § 411(b)(2) at 11, *Olem Shoe Corp. v. Wash. Shoe Co.*, 09 Civ. 23494 (S.D. Fla. Oct. 14, 2010), ECF No. 209.

Gareth Stevens has twice tried to begin the process of invalidating Registration No. VAu 529-623 for purposes of attacking Palmer/Kane's standing to bring this action by moving the Court

---

[7] Although this procedure is mandatory, the response provided by the Register is not binding on the Court. 17 U.S.C. § 411(b)(2) ("[T]he court shall request the Register of Copyrights to *advise* the Court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration." (emphasis added)); *DeliverMed*, 734 F.3d at 624-25 ("On remand, . . . the district court must ask the Register whether it would have refused DeliverMed's application had it been aware that DeliverMed had no written ownership transfer agreement at the time of its application. After receiving that *advisory* opinion, the court may then determine whether to invalidate DeliverMed's registration for the logo." (emphasis added) (footnote omitted)); Response of the Register of Copyrights to Request Pursuant to 17 U.S.C. § 411(b)(2) at 12, *Olem Shoe Corp. v. Wash. Shoe Co.*, 09 Civ. 23494 (S.D. Fla. Oct. 14, 2010), ECF No. 209 ("[T]he Register agrees with the Court's conclusion that a court will not be bound by the Register's response to a request made pursuant to § 411(b).").

to request an advisory opinion from the Register of Copyrights pursuant to Section 411(b)(2). ECF

Nos. 32, 55. The Court denied both motions on the ground that genuine factual disputes existed as

to whether Ms. Kane included inaccurate information regarding the publication status of Images 4-7

on the application for copyright registration "with knowledge that it was inaccurate." In denying

Gareth Stevens's second attempt, the Court explained as follows:

> The Court continues to exercise its discretion to require that Defendant establish
> as a factual matter that Plaintiff knowingly included inaccurate information on its
> registration application within the meaning of 17 U.S.C. § 411(b)(1) before issuing
> a request to the Register of Copyrights. As before, there remain factual disputes
> regarding (1) whether the photographs had been published when Ms. Kane
> completed an application form in 1999, (2) Ms. Kane's knowledge of their
> publication at the time, if any, and (3) whether the application form completed by
> Ms. Kane in 2001 was a continuation of an application process that had been
> ongoing since 1999 and was completed in good-faith reliance on directions from
> the Copyright Office. These factual issues require the weighing of evidence and
> the rendering of credibility determinations—tasks which the Court does not
> believe it can undertake at this stage.

*Palmer/Kane LLC v. Gareth Stevens Publ'g,* No. 15-cv-7404 (GHW), 2016 WL 6238612, at *4 (S.D.N.Y.

Oct. 24, 2016). Those same factual disputes still exist, and they still preclude the Court from making

a request to the Register of Copyrights or from invalidating the certificate for purposes of standing

to sue.

With respect to whether the Images were published before the date of the signing of the

1999 application form, Gareth Stevens offers evidence that Stock Market published and registered

numerous print catalogs and CD-ROMs containing photographs while it acted as Palmer/Kane's

exclusive licensing agent prior that date. But, as the Court explained earlier in this opinion, that

evidence does not permit the Court to specifically conclude that any of Images 4-7 were contained

in any of those materials. Thus, at best, the evidence serves as the basis for a possible inference that,

because Stock Market published a large number of photographs during that time period, it may also

have published some or all of the Images. The Court cannot resolve that inference in favor of

Gareth Stevens here, on summary judgment. *See Johnson,* 680 F.3d at 236 (stating that court is

"required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought").  On the other hand, the extra document appended to the 1991 application form stating that "[a] stock catalog/CD/web site containing these photographs were previously registered," *see* Kjellberg Decl., Ex. 52, at p. 3, and Ms. Kane's explanation for her removal of that document from her 2001 application form, raise additional questions and call for a credibility determination that cannot be made by the Court.

The same is true of the appearance of the Images on stockmarketphoto.com prior to the signing of the 1999 application.  The Copyright Act defines "publication" as

> the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending.  The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication.  A public performance or display of a work does not of itself constitute publication.

17 U.S.C. § 101.  As Gareth Stevens points out, the CO's administrative manual states, by way of example, that "[p]ublication occurs when copies of a photograph are offered to stock photography agencies for the purpose of licensing those copies to newspapers, magazines, and websites."  U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 1906.1 (3d ed. 2014) ("Compendium III").  While the views of the CO on the interpretation of the Copyright Act are not dispositive, its interpretations, like those of any other agency, "may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency."  *Morris v. Bus. Concepts, Inc.*, 283 F.3d 502, 505-06 (2d Cir. 2002) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139 (1944)).  The Court does not question the soundness of the CO's example.[8]  However, and particularly in light of Ms. Kane's declaration statement and deposition

___

[8] The Court does question its applicability to this case to some degree.  Section 1902 of the Compendium, entitled "What Constitutes Publication," explains in more general terms that "the legislative history indicates that publication occurs only (i) when copies or phonorecords are distributed by or with the authority of the copyright owner, or (ii) when an offer to distribute copies or phonorecords to a *group of persons* for further distribution, public performance, or public display is made by or with the authority of the copyright owner."  Compendium III § 1902 (emphasis added).  The Compendium then provides the "stock photo agencie*s*" examples in a set of examples illustrating its views on what the statutory phrase "offering to distribute copies or phonorecords to a *group of persons* for purposes of further distribution,

testimony that stockmarketphoto.com was in "beta" during the period prior to May 28, 1999, the record does not make clear whether the Images were provided to Stock Market "for the purpose of licensing" them during the relevant time period, or whether the placement of the Images on the website more generally constituted distribution of the Images "to the public."

If the Images were not provided to Stock Market "for the purpose of licensing" (even if, as Gareth Stevens contends, the Images were on the website and searchable), they may merely have been on display, which does not in itself constitute publication. *See* § 101 ("A public performance or display of a work does not of itself constitute publication."); H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976) 138 (stating that definition of "publication" in the 1976 Act "makes plain that any form of dissemination in which a material object does not change hands—performances or displays on television, for example—is not a publication no matter how many people are exposed to the work").

Courts have reached differing conclusions as to whether merely placing a file on a website constitutes "publication" within the meaning of the Copyright Act. *Compare McLaren v. Chico's FAS, Inc.*, No. 10-cv-2481 (JSR), 2010 WL 4615772, at *4 (S.D.N.Y. Nov. 9, 2010) (holding that the "claim that images composing the Collection were posted on her website would not . . . suffice to plead 'publication'"), *and Einhorn v. Mergatroyd Prods.*, 426 F. Supp. 2d 189, 197 (S.D.N.Y. 2006) ("merely posting a digital file" on the Internet does not amount to "publication" under the Copyright Act because it does not involve "sale or other transfer of ownership, or by rental, lease or lending"), *with Getaped.com, Inc. v. Cangemi*, 188 F. Supp. 2d 398, 402 (S.D.N.Y. 2002) (holding that website was "published" when it "went live" because source code could be freely copied, but relying

---

public performance, or public display" means. *Id.* § 1906.1 (emphasis added). In its initial explication of that statutory phrase, the Compendium cites to a portion of the House of Representatives committee report for the 1976 revisions of the Copyright Act stating that "the definition also makes clear that, when copies or phonorecords are offered to a *group of wholesalers, broadcasters, motion pictures, etc.*, publication takes place if the purpose is 'further distribution, public performance, or public display.'" H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976) 138 (emphasis added). The phrase "group of wholesalers, broadcasters, motion pictures, etc" tracks the plural statutory language "group of persons." While the Court is unsure whether providing photographs to a single licensing agency (or any single "person") would constitute "publication," it is not necessary for the Court to resolve the question here.

on cases in which files were posted on the Internet with some degree of intention that others would download them).

At the very least, the question of whether the appearance of the Images on stockmarketphoto.com prior to May 28, 1999 constituted "publication" of the Images requires resolution of factual disputes regarding the extent to which the website was available to the general public and the purpose for which the Images were posted. *See, e.g.*, *Elliott v. Gouverneur Tribune Press, Inc.*, No. 13-cv-055 (MAD), 2014 WL 12598275, at *3 (S.D.N.Y. Sept. 29, 2014) ("Defendants argue that Plaintiff published her photographs when she posted them on the internet. The *Getaped.com* decision, however, has been widely criticized, and it is not clear that the decision should control on the facts of the present case. . . . The fact intensive nature of this inquiry further demonstrates the inappropriateness of summary judgment at this time."); *see also Getaped*, 188 F. Supp. 2d at 402 (holding that website was published when it "went live").

Moreover, even assuming that the Images were "published" prior to May 28, 1999 by virtue of merely being posted on stockmarketphoto.com, the evidence in the record does not permit the Court to determine as a matter of law that Ms. Kane knew that mere posting on a website constituted publication at the time she signed the 1999 application form. As a result, the Court cannot conclude on summary judgment that the inaccurate information, if any, included on the 1999 application form was included "with knowledge that it was inaccurate," as is required under Section 411(b). *See Archie M.D., Inc. v. Elsevier, Inc.*, -- F. Supp. 3d --, 2017 WL 3601180, at *7 (S.D.N.Y. Aug. 20, 2017) (holding there was "no dispute that [Plaintiff's representative] did not state that the animations in the collection were unpublished 'with knowledge that [that information] was inaccurate,'" even though he knew the animations had been licensed, because evidence did not show he "knew licensing constituted publication," and stating that "whether the Work had been published by virtue of its licensing to Elsevier was an unsettled legal question at the time [he] sought to register the animations" (second alteration in original)).

With respect to whether Ms. Kane included inaccurate information on the 2001 application form "with knowledge that it was inaccurate," the parties provide no additional evidence beyond what was before the Court—and found to be pervaded with factual disputes—previously. The Court need not repeat its analysis of that evidence in full here. In brief, although Ms. Kane concedes that the Images had been published at some point prior to her signing of the 2001 application form, she has submitted sufficient evidence that she subjectively believed she was following the CO's instructions to withstand summary judgment. As the Court previously explained:

> [T]here remains a genuine factual dispute concerning whether Ms. Kane "knew" the information was "inaccurate" in the relevant sense. This is so because . . . the issue of what "knowing" means *in this context* cannot be separated from the fact that . . . Ms. Kane relied on Copyright Office advice in preparing her corrected application. Put another way, context matters. If Ms. Kane had in fact disclosed to the Copyright Office that the photographs had been published, but the Copyright Office nevertheless instruction her to complete the 2001 application form in the way that she did, Ms. Kane might not have subjectively known the information that she included on the application form was inaccurate.

*Palmer/Kane*, 2016 WL 6238612, at *4. With that explanation in mind, it is easy to explain why Gareth Stevens is incorrect when it contends that "whether the information regarding publication status that Palmer/Kane included in [the 2001 application form][ ] was objectively accurate on that date, is all that is relevant" and why it misses the point when it states that "[a]s a matter of law, [the 2001] application is not a 'continuation,' 'revision,' or 'correction' of, and does not relate back to, any earlier unsuccessful application." Def.'s Mem. in Supp. of Mot. for Summ. J. (ECF No. 79) ("Def.'s Mem.") at 6-7. The relevant question under Section 411(b) is not what the law or CO rules or policy permitted, or whether the form was "objectively accurate." *See Archie MD*, 2017 WL 3601180, at *7 (holding that plaintiff did not include inaccurate information "with knowledge that it was inaccurate" even though plaintiff knew facts that preclude registration as an objective matter). To make that the test would be to effectively ignore Section 411(b)(1)(A).

At the same time, the Court must note an inaccuracy in Palmer/Kane's briefing. In its opposition to Gareth Stevens's motion, Palmer/Kane asserts that "[t]he Court has now found *twice* that there is no proof" that Ms. Kane "submitted inaccurate with information with [the 2001 application form], knowing that it was inaccurate." Pl.'s Opp'n at 2. That is not correct. As the Court has made clear here and in its previous rulings in this case—and, indeed, as Palmer/Kane states elsewhere in the same brief—the Court has held that there is a genuine dispute of material fact on that question.

Apparently recognizing that a *third* attempt to make the same point from essentially the same evidence might be unavailing, Gareth Stevens attempts to press a new theory for why Palmer/Kane lacks standing to institute this action. Gareth Stevens contends that, "[e]ven if Registration No. VAu 529-623 were a valid registration of an unpublished collection, Images Nos. 4, 5, 6, and 7 would not be entitled to protection" because those Images were undisputedly published prior to 2001. Def.'s Mem. at 15-17. In making that argument, Gareth Stevens relies almost entirely on *Family Dollar Stores, Inc. v. United Fabrics International, Inc.*, 896 F. Supp. 2d 223 (S.D.N.Y. 2012) for the proposition that "[a] registration of a purportedly unpublished collection is invalid with respect to previously published works in the collection because the erroneous inclusion of published works in an unpublished collection is 'material' rather than 'technical' in nature." Def.'s Mem. at 15-16 (citing *Family Dollar*, 896 F. Supp. 2d at 231-32. In other words, Gareth Stevens reads *Family Dollar* as endorsing an approach under which a court may invalidate a certificate (at least in part) for standing purposes without regard to the requirements of Section 411(b)(1)(A).

In its October 24, 2016 opinion and order, the Court noted its concerns about the reasoning of *Family Dollar*. *See Palmer/Kane*, 2016 WL 6238612, at *4 n.2. The Court noted in particular that *Family Dollar*'s "proposition that a showing of fraud is required only when the error is technical rather than material appears to be irreconcilable with the § 411(b)(2) requirements that the Register of Copyrights be consulted regarding whether the inaccuracy is material" and that *Family Dollar*'s

determination "that § 411(b) does not apply at all when the inaccuracy is material . . . seems to be inconsistent with the statute's requirement that the Register of Copyrights weigh in on the issue of materiality in all case." *Id.* Another court in this District recently agreed, and additionally explained:

> *Family Dollar*'s conclusion, that the PRO IP Act did not apply because the error in question would have caused the Copyright Office to refuse registration, is hard to square with § 411(b)(1). *Family Dollar* finds that the condition in clause (B), *i.e.*, the materiality of the inaccuracy, is satisfied, but then takes that conclusion to entail that the condition in clause (A), *i.e.*, the knowledge of the inaccuracy, is irrelevant. But Section 411(b)(1) presents a conjunctive test: both conditions must be satisfied in order for an inaccuracy in a registration to defeat a claim.

*Archie MD*, 2017 WL 3601180, at *6. The court in *Archie MD* then concluded that, "in order to comply with the clear directive in § 411(b)(1), a copyright infringement claim should not be dismissed on account of inaccurate information that was inadvertently included in the copyright registration, whether or not the inaccurate information is material." *Id.*

Whatever may have been the approach developed by the courts prior to the PRO IP act, Section 411(b) now sets forth a particular standard and procedure to be used in all instances before finding that a registration certificate issued by the CO fails to confer standing to institute a civil action for copyright infringement. But Gareth Stevens rests its new theory of invalidity on a case that, in this Court's respectful view, is inconsistent with the clear language of the statute.[9]

\* \* \*

For the reasons above, the Court concludes that triable issues of fact exist regarding whether Palmer/Kane included inaccurate information on its application for Registration No. VAu 529-623 with knowledge that it was inaccurate within the meaning of Section 411(b). Because such a finding is a statutory prerequisite to invalidating a registration certificate for standing purposes, summary

---

[9] Gareth Stevens's quotation from *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 845 (9th Cir. 2012)—that "unpublished designs . . . would retain copyright protection, but that the previously published designs would not"—is taken out of context and provides no help to Gareth Stevens here. For one thing, the court in *L.A. Printex* did not circumvent Section 411(b); instead, it applied Section 411(b) and concluded that there were no grounds to invalidate the registration certificate. *Id.* at 854. Furthermore, the quoted portion of the opinion is a recounting of what the CO told L.A. Printex Industries when it contacted the CO after realizing its registration contained an error. *Id.* at 845-46. It was not a statement of the law.

judgment may not be granted for either party on this issue. If the issue is resolved by the jury in Gareth Stevens's favor, the Court will then be required to refer the question to the Register of Copyrights pursuant to Section 411(b)(2) before making an ultimate determination.

## 2. Whether Gareth Stevens Made Infringing Use of the Images

To prevail on a claim of copyright infringement, a plaintiff must prove (i) ownership of a valid copyright; and (ii) unauthorized use of protected elements of the copyrighted work. *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). Palmer/Kane's ownership of a valid copyright in the Images is not contested here.[10] Nor does Gareth Stevens contend that it did not use the Images. Thus, assuming *arguendo* that Palmer/Kane has standing to bring this action, the only merits question is whether Gareth Stevens's use of the Images was authorized.

"A claim for copyright infringement will fail if the challenged use of the copyrighted work is authorized by a license." *Wu v. Pearson Educ., Inc.*, No. 10-cv-6357 (KBF), 2013 WL 145666, at *4 (S.D.N.Y. Jan. 11, 2013) (citing *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998)); *see also Davis v. Blige*, 505 F.3d 90, 100 (2d Cir. 2007) ("A valid license . . . immunizes a the licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor."); *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 128 (S.D.N.Y. 2015) ("[U]se of a copyrighted work within the scope of a valid license is non-infringing as a matter of law."). "Determining whether a defendant's activities fall within the scope of an existing license essentially involves a question of contract interpretation." *Reinhardt v. Wal-Mart Stores, Inc.*, 547 F. Supp. 2d 346, 352 (S.D.N.Y. 2008).

As with the question of Palmer/Kane's standing to sue for infringement, genuine disputes of material fact preclude summary judgment on the question whether Gareth Stevens used the Images

---

[10] As explained above, Gareth Stevens's challenge to the validity of Palmer/Kane's copyright *registration* has no bearing on whether Palmer/Kane owns a copyright in the Images. A copyright was created in the Images the moment they were created, and the rights were transferred from Palmer/Kane Inc. to Palmer/Kane LLC in 2008. Def.'s 56.1 ¶ 4.

pursuant to and within the scope of a license. On one hand, Palmer/Kane contends that the documents entitled Invoice and License Agreement constitute the only licenses to use the Images and that the dates on those documents (all of which fall after the alleged pre-license infringing uses) indicate the date on which the licenses took effect. *See* Kjellberg Decl., Exs. 82, 85, 88. Thus, under Palmer/Kane's theory of the case, Gareth Stevens's use of the Images is infringing because it occurred prior to the start of any valid license.

On the other hand, Gareth Stevens points to the Pricing Agreement between Hodder and Corbis, which is dated *prior* to the alleged pre-license infringing uses. *See* Kjellberg Decl., Ex. 81. The Pricing Agreement speaks about "future licensing" and contains a list of relatively detailed "terms of license." *Id.* It also provides that Hodder "will order and license at least £80,000 worth of rights managed images and royalty free images ('Minimum Commitment')" and outlines an "invoicing/usage notification" procedure whereby Hodder will "notify Corbis of the Images used on a per usage basis" and "Corbis will invoice [Hodder] according to" the pricing schedule contained therein. *Id.*

Gareth Stevens also provides a declaration from a picture researcher who works for Hodder and related companies, and who is familiar with and has been involved in Hodder's practices with respect to securing rights to stock photographs from Corbis. Decl. of Diana Morris (ECF No. 91) ("Morris Decl."). Ms. Morris attests that the licensing process was as follows during the time that the books that are the subject of this action were produced:

> Low resolution photographs were supplied by Corbis for selection and design of the books. Once the editors had selected the photographs that they wanted to use, I would request high resolution images for use in printing and production. Corbis would send those, and once they arrived, we incorporated them into the files for the book and they were sent to production. We then wrote a letter to Corbis for each title setting out the name of the book and the list of photograph with the territories in which they would be used so that the pricing scale would be applied. Corbis then sent an invoice in due course, which would be paid. The books would have been printed by the time the invoice arrived and was paid. Although we tried to make sure that the invoices have been received and paid by the publication date (which could be weeks or months from the printing date),

this was not always the case as it depended on the speed with which the invoices were sent following our letters. We regarded the sending of the high resolution images as permission that we may incorporate them in the books. This was not dependent on paying for them which occurred much later.

*Id.* ¶¶ 3-4. That description appears to be consistent with the "invoicing/usage notification" procedure outlined in the Pricing Agreement, whereby Hodder was to notify Corbis of its usage of particular images, and Corbis would invoice Hodder later. Kjellberg Decl., Ex. 81. Gareth Stevens also submits an expert report from Michael N. Ross, who has worked in the publishing industry for 30 years, including as a Senior Vice President and Education General Manager of Encyclopedia Britannica. Decl. of Michael N. Ross in Supp. of Def.'s Mot. for Summ. J. (ECF No. 82) ("Ross Decl."), Ex. 1. Mr. Ross explains that

[i]t is customary for publishers who publish books by seasons to aggregate all of their titles for a season in their reporting to a photo agency or similar image licensing agency, even if the books were not published at the same time. Thus, the invoices for photographs contained in a season's books may show dates that are several months subsequent to when the books were printed and published. This is a standard and customary practice . . . . In my experience, stock photo agencies understand and accept the realities of the book publishing timeline and customarily allow for post-publication licensing as a matter of course.

A typical order of events would be as follows: a number of titles are commissioned for a season; licenses are discussed and working elements are put into production; books are printed, delivered and received; and final printing and licensing fees are paid after the books are received in inventory by the publisher.

*Id.* at 5.

Even if no express written license was in effect during the period between Gareth Stevens's initial uses of the Images and the issuance of the relevant Invoice and License Agreement, an implied license to use copyrighted works may be found to exist where there was a "'meeting of the minds' between the parties to permit the particular usage at issue." *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 124 (S.D.N.Y. 2012). "Although exclusive licenses to a copyrighted work must be in writing, nonexclusive licensing may . . . be granted orally, or may even be implied from conduct. When the totality of the parties' conduct indicates an intent to grant such permission, the result is a

nonexclusive license." *Latour v. Columbia Univ.*, 12 F. Supp. 3d 658, 662 (S.D.N.Y. 2014) (internal

quotation marks and citations omitted).

With the above in mind, the Court concludes that a genuine dispute of material fact exists as

to whether Gareth Stevens's use of the Images was made pursuant to and within the scope of a valid

license. While Gareth Stevens presents substantial evidence in support of its side of the story, there

are aspects of the record that lead the Court to believe it cannot decide this question as a matter of

law. First, the Invoices and License Agreements do not expressly state the time period that they

cover, but they purport to incorporate by reference a standard licensing term running one year from

the date the invoice was issued. *See, e.g.*, Kjellberg Decl., Ex. 82; Shuman Decl., Ex. 6. Second, while

the Pricing Agreement provided that any conflict between it and Corbis's Terms and Conditions

(which included the default one-year licensing period) would be resolved in favor of the Pricing

Agreement, the fact that the Pricing Agreement states that it covers "future licensing," Kjellberg

Decl., Ex. 81, gives the Court pause in concluding that there is only one way to resolve this

ambiguity. Third, while Gareth Stevens provides evidence of the course of conduct between the

parties and industry practice, which could give rise to an implied license, that evidence is not so

overwhelming that a jury could not choose to disregard it in light of the above concerns.

For those reasons, the Court concludes that a jury could find for either party on the question

of whether the Images were used pursuant to and within the scope of a valid license, whether that

license was express or implied.[11] Accordingly, the question cannot be resolved by the Court as a

---

[11] Because the Court concludes that, even assuming the absence of an express license, a genuine dispute of material fact exists with respect to whether an implied license covered the allegedly infringing uses at issue here, the Court need not address the legal question whether a license to use a copyrighted work can apply retroactively to cure infringement. Courts in this district have reached differing conclusions on whether and how that question was resolved by the Second Circuit in *Davis v. Blige*, 505 F.3d 90 (2d Cir. 2007). *Compare, e.g., Young-Wolff v. John Wiley & Sons, Inc.*, No. 12-cv-5230 (JPO), 2016 WL 154115, at *4 (S.D.N.Y. Jan. 12, 2016) (holding that *Davis* "is addressed to the co-ownership context and does not preclude retroactive licenses granted by an agent when that agent has been given such authority by the copyright owner"), *with Palmer/Kane LLC v. Rosen Book Works LLC*, 204 F. Supp. 3d 565, 576 (S.D.N.Y. 2016) (explaining that *Davis*'s holding that "a license or assignment in copyright can only act prospectively" was not limited to the context of co-ownership).

matter of law.

The above-described factual disputes also bear on whether Gareth Stevens's alleged *post-*license sales of the books containing the Images constituted copyright infringement. First, the various relevant documents contain different language concerning the lengths of the license terms. Even more to the point, however, the question whether the initial use of the Images in the books was authorized by a license is relevant to whether the sales are protected by the first sale doctrine. Section 109(a) of the Copyright Act provides that

> [n]otwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.

17 U.S.C. § 109(a). Thus, "once a copy [of a copyrighted work] has been lawfully sold (or its ownership otherwise lawfully transferred), the buyer of that *copy* and subsequent owners are free to dispose of it as they wish. In copyright jargon, the 'first sale' has 'exhausted' the copyright owner's § 106(3) exclusive distribution right." *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 524 (2013). The first sale doctrine applies to copies of works lawfully made abroad. *Id.* at 525.

The Coedition Agreements between Hodder and Gareth Stevens show that the books containing the Images were created by Hodder in the UK, printed in Hong Kong, and then sold and shipped to Gareth Stevens. Those agreements provided in relevant part:

> The Proprietor [Hodder] will . . . produce 5,000 bound copies of the Licensed Edition in hardback format at a cost of US$3.30 per copy inclusive of royalty . . . , FOB Hong Kong. The Proprietor will . . . arrange for such copies to be despatched to the Publishers [Gareth Stevens] by 10th June [2004/2005]. A variation of the quantity specified above of +/- 5% will constitute full delivery and the Publishers will pay the Proprietor for all copies delivered within such guidelines. . . . The Publishers will pay the Proprietor for all copies of the first printing of the Licensed Edition as follows: one third within 30 days of signature of this Agreement by both parties, one third on approval of the ozalids by the Publishers and the balance within 60 days of despatch of such copies as specified in 4.3 above.

Kjellberg Decl., Exs. 3-4, ¶¶ 4.3, 4.4. The WSK invoices, issued on June 8, 2004 and June 18, 2005,

provide further evidence that the above provisions of the Coedition Agreements were implemented as drafted. Kjellberg Decl., Exs. 84, 87, 90.

Palmer/Kane contends that the copies of the books alleged sold after the expiration of the licenses were not "lawfully made," and thus cannot implicate the first sale doctrine, "[b]ecause Hodder/Gareth Stevens did not have a license to use Images Nos. 4-7 when they printed copies of the publications." Pl.'s Reply Mem. in Supp. of Mot. for Summ. J. (ECF No. 94) at 9. As the Court has already explained, however, that very issue is the subject of a material factual dispute. Therefore, the same factual disputes that preclude the Court from determining as a matter of law whether the alleged printings were licensed prevent the Court from determining whether the alleged post-license sales constituted copyright infringement.

## IV.    CONCLUSION

For the foregoing reasons, Gareth Stevens's motion for summary judgment is GRANTED with respect to Images 2 and 8, and is DENIED in all other respects. Palmer/Kane's motion for summary judgment is DENIED in its entirety.

The Clerk of Court is directed to terminate the motions pending at ECF Nos. 72 and 78.

SO ORDERED.

Dated:  September 7, 2017
New York, New York

_____
GREGORY H. WOODS
United States District Judge